333 F.3d 1082
 HEMP INDUSTRIES ASSOCIATION; Nutiva, Inc.; Tierra Madre, LLC; Hemp Oil Canada, Inc.; North Farm Cooperative; Kenex Ltd.; Nature's Path Foods USA Inc.; Hempola, Inc., Petitioners,
v.
DRUG ENFORCEMENT ADMINISTRATION; The Honorable Asa Hutchinson, Administrator, Respondents.
 No. 01-71662.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted April 8, 2002.
 Filed June 30, 2003.
 
 COPYRIGHT MATERIAL OMITTED Patrick Goggin, Sandler, Reiff & Young, P.C., San Francisco, CA, for the appellants-petitioners.
 Joseph E. Sandler, Sandler, Reiff & Young, P.C., Washington, D.C., for the appellants-petitioners.
 Daniel Dormont, Drug Enforcement Agency, Alexandria, VA, for the appellees-respondents.
 On Petition for Review of an Order of the Drug Enforcement Agency.
 Before SCHROEDER, Chief Judge, B. FLETCHER and KOZINSKI, Circuit Judges.
 Opinion by Judge BETTY B. FLETCHER; Dissent by Judge KOZINSKI.
 OPINION
 BETTY B. FLETCHER, Circuit Judge:
 
 INTRODUCTION
 
 1
 Petitioners challenge the validity of the rule issued by the respondent that bans the sale of consumable products containing hemp oil, cake, or seed. They contend that the rule is a legislative rule that is subject to the notice and comment procedure required by the Administrative Procedures Act (APA). Respondent contends that the rule is an interpretive rule,[1] and need not undergo such procedures. We hold that because the rule would force plaintiffs either to risk sanction or to forego the theretofore legal activity of selling products containing trace amounts of naturally occurring THC, it is a legislative rule, and should have been subjected to notice and comment procedures.
 
 I. JURISDICTION
 
 2
 As a threshold matter, we must ask whether we have jurisdiction to hear this case under the administrative appeal provision of the Controlled Substances Act, 21 U.S.C. § 877 ("CSA"). This section provides that:
 
 
 3
 All final determinations, findings, and conclusions of the Attorney General under this title shall be final and conclusive decisions of the matters involved, except that any person aggrieved by a final decision of the Attorney General may obtain review of the decision in the United States Court of Appeals for the District of Columbia or for the circuit in which his principal place of business is located upon petition filed with the court and delivered to the Attorney General within thirty days after notice of the decision. Findings of fact by the Attorney General, if supported by substantial evidence, shall be conclusive.
 
 
 4
 The rule under challenge was published on October 9, 2001. 66 Fed.Reg. 51530. Petitioners filed a timely petition for review on October 19. The question of whether we have jurisdiction thus depends on whether this is a final determination of the Attorney General. Petitioners, arguing that the rule is a final determination, urge this court to accept jurisdiction. Respondent agrees that, although there is no precedent as to whether an interpretive rule is final within the meaning of § 877, this court has jurisdiction.
 
 
 5
 Since we conclude that the rule is legislative, in that it is final agency action imposing obligations and sanctions in the event of violation, we have jurisdiction on the facts of this case. We need not decide whether we would have original jurisdiction over an interpretive rule or whether our assumption of jurisdiction would oust district court jurisdiction under the APA.
 
 II. FACTUAL AND PROCEDURAL BACKGROUND
 
 6
 The petitioners describe themselves as companies that manufacture, distribute, and/or sell processed hemp seed or oil, or food and beverages that contain nutritionally-valuable hemp seed or oil in the United States. Since 1937, the statute controlling marijuana has excluded the oil and sterilized seed of the plant Cannabis sativa L., commonly known as hemp, from the definition of marijuana. 21 U.S.C. § 802(16). Relying on this exemption, U.S. individuals and businesses, including the petitioners, have purchased and sold consumable products containing sterilized hemp seeds and oil, which generally are imported from Canada or Europe.[2]
 
 
 7
 Tetrahydrocannabinols ("THC") is the active ingredient in marijuana. Hemp seeds and oil typically contain minuscule trace amounts of THC, less than 2 parts per million in the seed and 5 parts per million in the oil. Enhanced analytical testing indicates that "a `THC Free' status is not achievable in terms of a true zero." Petitioner's Reply on Emergency Motion for Stay, Exh. 2 Crew Dec. at 2. Nonetheless, the amount of trace THC present in hemp seed and oil is sufficiently low to prevent confirmed positives in urine drug-testing for marijuana even from extended and extensive consumption of hemp foods. Leson, Pless, Grotenhermen, Kalant and ElSohly, "Evaluating the Impact of Hemp Food Consumption on Workplace Drug Tests," 25 Journal of Analytical Toxicology 691 (Nov./Dec.2001).
 
 
 8
 On October 9, 2001, the DEA issued three rules. The first is what the DEA denominates an "Interpretive Rule," purporting to interpret both the CSA and the DEA regulations to ban all naturally-occurring THC, including that found in hemp seed and oil, on Schedule I. 66 Fed. Reg. 51,530 (October 9, 2001). The DEA did not provide notice or solicit comments with regard to this rule. The second is an "Interim Rule," exempting industrial hemp products not intended for human consumption from the application of the CSA and providing a 120-day grace period for persons to dispose of existing inventories of consumable products containing naturally occurring THC. 66 Fed.Reg. 51,539 (October 9, 2001). The third rule is a proposed amendment to the DEA regulations to add natural THC to the listing of THC in Schedule I. 66 Fed.Reg. 51,535 (October 9, 2001).[3]
 
 
 9
 The petitioners bring this appeal to challenge the putative interpretive rule, arguing that it is in reality an invalid legislative rule that was promulgated without observance of the procedures required by the APA.[4]
 
 III. DISCUSSION
 A. Standard of review
 
 10
 Whether an agency rule is interpretive or legislative is a question of law reviewed de novo. Chief Probation Officers of Cal. v. Shalala, 118 F.3d 1327 (9th Cir.1997).
 
 B. Standing
 
 11
 The DEA argues that the petitioners lack standing to challenge the putative interpretive rule. To establish standing, the petitioners must demonstrate three elements:
 
 
 12
 First, plaintiffs must clearly demonstrate that they have suffered an "injury in fact" — an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of — the injury has to be fairly traceable to the challenged action of the defendant. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.
 
 
 13
 Lujan v. Defenders of Wildlife, 504 U.S. 555, 559, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The DEA claims that the petitioners cannot demonstrate an injury in fact because they have not shown that the DEA or any other agency has seized their products or commenced criminal proceedings against them as a result of the putative interpretive rule. This fact does not prevent them from having standing.
 
 
 14
 In City of Auburn v. Qwest, 260 F.3d 1160, 1171 (9th Cir.2001), this court observed that, "[i]f [p]romulgation of the challenged regulations present[s] plaintiffs with the immediate dilemma to choose between complying with newly imposed, disadvantageous restrictions and risking serious penalties for violation, the controversy is ripe." Because standing overlaps substantially with ripeness with respect to the promulgation of new regulations, there is also standing in these circumstances. Id. at 1172 n. 6. (citation and internal quotation marks omitted). The petitioners meet this test. If the rule stands, the petitioners must either stop manufacturing, distributing, and selling in the United States hemp seed and oil products or face criminal penalties for violating the DEA's restrictions on Schedule I substances.
 
 
 15
 The DEA emphasizes that petitioners state only that their products "may" contain THC rather than affirmatively stating that they do contain THC. But the petitioners have presented evidence that a true zero level of THC in hemp seed and oil is not achievable. Thus, because the DEA has failed to indicate any limit of detectable amounts for THC, the manufacture, distribution, and sale of hemp seed and oil products, which inevitably contain some trace THC, could prompt enforcement actions by the DEA. For this reason, petitioners have standing.
 
 C. The validity of the DEA's rule
 1. Legal framework
 
 16
 An agency can issue a legislative rule only by using the notice and comment procedure described in the APA, unless it publishes a specific finding of good cause documenting why such procedures "are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b), (b)(B). In contrast, an agency need not follow the notice and comment procedure to issue an interpretive rule. § 553(b)(A). The distinction between the two procedures is key in this case. If the DEA's rule is genuinely an interpretive rule, it is valid despite the absence of notice and comment procedures. If the DEA's rule has the effect of a legislative rule, it is invalid because of the agency's failure to comply with the APA procedures.
 
 
 17
 While the DEA has characterized its rule as an interpretive rule, the court need not accept the agency characterization at face value. See Gunderson v. Hood, 268 F.3d 1149, 1154 n. 27 (9th Cir. 2001); Richard L. Pierce, Jr., Distinguishing Legislative Rules From Interpretive Rules, 52 Admin. L.Rev. 547, 555 (2000).
 
 
 18
 Courts have struggled with identifying the difference between legislative rules and interpretive rules. In general terms, interpretive rules merely explain, but do not add to, the substantive law that already exists in the form of a statute or legislative rule. Yesler Terrace Community Council v. Cisneros, 37 F.3d 442, 449 (9th Cir.1994). Legislative rules, on the other hand, create rights, impose obligations, or effect a change in existing law pursuant to authority delegated by Congress. Id.
 
 
 19
 An opinion of the D.C. Circuit provides a helpful framework for distinguishing between interpretive and legislative rules. In American Mining Congress v. Mine Safety & Health Administration, 995 F.2d 1106, 1109 (D.C.Cir.1993), the D.C. Circuit noted that valid legislative rules, unlike interpretive rules, have the "force of law." See also Shalala v. Guernsey Memorial Hospital, 514 U.S. 87, 99, 115 S.Ct. 1232, 131 L.Ed.2d 106 (1995) ("Interpretive rules... do not have the force and effect of law and are not accorded that weight in the adjudicatory process...."). It identified the following three circumstances in which a rule has the "force of law":[5]
 
 
 20
 (1) when, in the absence of the rule, there would not be an adequate legislative basis for enforcement action;
 
 
 21
 (2) when the agency has explicitly invoked its general legislative authority; or
 
 
 22
 (3) when the rule effectively amends a prior legislative rule.
 
 
 23
 Id. at 112, 115 S.Ct. 1232; see also Pierce, supra at 555-57.
 
 
 24
 The DEA's primary argument is that it does not represent its putative interpretive rule as having the force of law. It notes that in Splane v. West, 216 F.3d 1058, 1064 (Fed.Cir.2000), the Federal Circuit concluded that references to regulations having "the force and effect of law" are to the binding effect of that regulation on tribunals outside the agency. This clarification was made in rejecting an argument by petitioners who challenged an interpretive rule of an agency as having the "force and effect of law" because it bound the agency's own tribunals. Id.
 
 
 25
 The fact that an agency claims that its rule does not bind tribunals outside the agency, however, does not end the inquiry into whether the rule is legislative. Regardless of the agency's claims, if there is no legislative basis for enforcement action on third parties without the rule, then the rule necessarily creates new rights and imposes new obligations. This makes it legislative. Yesler Terrace Community, 37 F.3d at 449. In addition, when an agency does not hold out a rule as having the force of law, it may still be legislative if it is inconsistent with a prior rule having the force of law. See Blattner & Sons, Inc. v. Secr. of Labor, 152 F.3d 1102, 1109 (9th Cir.1998) ("`[I]f a second rule repudiates or is irreconcilable with a [prior legislative rule], the second rule must be an amendment of the first; and, of course, an amendment to a legislative rule must itself be legislative.'"); Chief Probation Officers of Cal. v. Shalala, 118 F.3d 1327, 1337 (9th Cir.1997) ("If an agency maintains that a rule, not held out as having the force of law, is mandated by statute, it will be legislative under Guernsey only if it is inconsistent with another rule having the force of law."). These principles found in Ninth Circuit case law reflect the three criteria articulated in American Mining for distinguishing legislative and interpretive rules.
 
 
 26
 The third criterion appears to be the primary source of contention in this case. Does the DEA's rule amend the DEA's own regulation on the coverage of naturally occurring THC in Schedule I? If so, it cannot be an interpretive rule because only legislative rules (i.e. rules having the force of law) can amend a prior legislative rule. In order to answer this question, the panel must examine the status of the law prior to the issuance of the rule.
 
 2. Legislative and regulatory history
 
 27
 The CSA lists marijuana and THC separately on Schedule I. See 21 U.S.C. § 812(c), Sch. I(c)(10) & (17). Marijuana is defined by the CSA as follows:
 
 
 28
 [A]ll parts of the plant Cannabis sativa L., whether growing or not; the seeds thereof; the resin extracted from any part of such plant; and every compound, manufacture, salt, derivative, mixture, or preparation of such plant, its seeds or resin. Such term does not include the mature stalks of such plant, fiber produced from such stalks, oil or cake made from the seeds of such plant, any other compound, manufacture, salt, derivative, mixture, or preparation of such mature stalks (except the resin extracted therefrom), fiber, oil, or cake, or the sterilized seed of such plant which is incapable of germination.
 
 
 29
 21 U.S.C. § 802(16) (emphasis added). The petitioners' products, hemp oil and sterilized seed, are explicitly exempted from this definition. This definition was carried over into the CSA from the Marijuana Tax Act of 1937 when the CSA was enacted and moved the plethora of drug laws into one comprehensive statute.
 
 
 30
 The Senate Report to the 1937 Act explained the exemption:
 
 
 31
 The flowering tops, leaves, and seeds of the hemp plant contain a dangerous drug known as marihuana.... The term "marihuana" is defined so as to bring within its scope all parts of the plant having the harmful drug ingredient, but so as to exclude the parts of the plant in which the drug is not present. The testimony before the committee showed definitely that neither the mature stalk of the hemp plant nor the fiber produced therefrom contains any drug, narcotic, or harmful property whatsoever and because of that fact the fiber and mature stalk have been exempted from the operation of the law.
 
 
 32
 S. Rep. 900, 75th Cong., 1st Sess. 1, 4 (1937) (emphasis added). The congressional hearings show that Congress was informed by some experts that hemp seed and oil contain small amounts of the active ingredient in marijuana, but that the active ingredient was not present in sufficient proportion to be harmful. Blue Brief at 17-22 (citing Hearings on H.R. 6385, 75th Cong., 1st Sess. 8 (April 1937); U.S. Senate Finance Committee, Hearings on H.R. 6906, 75th Cong., 1st Sess. 9 (1937)).
 
 
 33
 By 1968, it became known that the active ingredient in marijuana, THC, was being produced synthetically and should be controlled. Pursuant to the Drug Abuse Control Amendments of 1965, P.L. 89-74, 79 Stat. 226 ("DACA"), the Bureau of Narcotics and Dangerous Drugs ("BNDD"), the DEA's predecessor, promulgated the following regulation to cover synthetic THC:
 
 
 34
 The Director has investigated and designates all drugs, unless exempted by regulations in this part, containing any amount of the following substances as having a potential for abuse because of their:
 
 
 35
 . . .
 
 
 36
 (3) Hallucinogenic effect:
 
 
 37
 . . .
 
 
 38
 Synthetic equivalents of the substances contained in the plant, or in the resinous extractives of Cannabis, sp. and/or synthetic substances, derivatives, and their isomers with similar chemical structure and pharmacological activity such as the following:
 
 
 39
 DELTA1 cis or trans tetrahydrocannabinol, and their optical isomers.
 
 
 40
 DELTA6 cis or trans tetrahydrocannabinol, and their optical isomers.
 
 
 41
 DELTA3,4 cis or trans tetrahydrocannabinol, and its optical isomers.
 
 
 42
 21 C.F.R. § 320.3(c) (1970) (emphasis added).[6]
 
 
 43
 Thereafter, Congress passed the Comprehensive Drug Abuse Prevention and Control Act of 1970 ("DAPCA") and added THC to Schedule I in the statute.[7] See 21 U.S.C. § 812(c), Schedule I(c)(17). The DEA cites nothing in the legislative history of the act to show that the 1970 Congress consciously intended to cover naturally-occurring THC under THC as well as under marijuana. Notably, if naturally-occurring THC were covered under THC, there would be no need to have a separate category for marijuana, which obviously contains naturally-occurring THC. Yet Congress maintained marijuana as a separate category. P.L. 91-513, 84 Stat. 1236, 1242 (1970).
 
 
 44
 The BNDD regulations were reorganized pursuant to the DAPCA. The THC regulation was amended, without discussion, to appear exactly as it now appears at 21 C.F.R. § 1308.11(d)(27). See 36 Fed.Reg. 4928, 7776 (1971); 21 C.F.R. § 308.11(d)(17) (1972). The only change in the regulation was to add the heading "Tetrahydrocannabinols," with the corresponding Administrative Controlled Substance Code Number 7370, above the reference to synthetic equivalents of the substances found in the Cannabis plant.
 
 3. Application of legal framework
 
 45
 Were there no regulation or legislative history on the subject, the DEA's position on the coverage of naturally-occurring THC could be characterized as an interpretation of the CSA, which lists THC generally without qualification in Schedule I. However, such an interpretation would be specious, as it would render superfluous the separate listing of marijuana and would nullify the explicit exemption of hemp seed and oil from the coverage of marijuana. But, wrong though such an interpretation might be, it would not be a legislative rule. Since the DEA is not holding the rule out as having the force of law, the rule would merely be clarifying the enforceable statutory coverage. See Chief Probation Officers, 118 F.3d at 1337 ("If an agency maintains that a rule, not held out as having the force of law, is mandated by statute, it will be legislative under Guernsey only if it is inconsistent with another rule having the force of law.").
 
 
 46
 However, in this case, the agency is not operating in a regulatory vacuum. A DEA regulation interpreting the coverage of THC exists. Thus, the DEA purports to be interpreting its THC regulation as well as the CSA. To "interpret" the regulation, the DEA's rule must be consistent with the regulation. We are back to our original question: whether the DEA's rule is inconsistent with the current DEA regulation, which has the force of law and cannot be amended except by another legislative rule. Id.
 
 
 47
 In light of the regulatory history recounted above and the plain language of the DEA regulation, it seems obvious that the DEA's rule covering natural THC is inconsistent with the current regulation. As described above, the current regulation lists THC in Schedule I as follows:
 
 Tetrahydrocannabinols .......... 7370
 
 48
 Synthetic equivalents of the substances contained in the plant, or in the resinous extractives of Cannabis, sp. and/or synthetic substances, derivatives, and their isomers with similar chemical structure and pharmacological activity....
 
 
 49
 21 C.F.R. § 1308.11(d)(27). THC, as used in the regulation, is defined as synthetic THC. The regulatory history going back to the 1968 BNDD regulation makes clear that this was the original intended coverage. There is absolutely no indication that the amendment in 1971, adding the heading "Tetrahydrocannabinols" and a code number, was intended to change the substantive meaning of the regulation.[8]
 
 
 50
 Indeed, after the change in the regulation in 1971 the DEA indicated that the regulation did not cover organic THC. In 1975, the DEA published a notice in the Federal Register in response to certain litigation over the propriety of including marijuana in Schedule I. The Acting Administrator for the DEA wrote that "[s]eeds incapable of germination are not covered by ... the [Drug Abuse Prevention and Control Act of 1970]." 40 Fed. Reg. 44167 (Sept. 25, 1975). The DEA, thus, gave effect to the exemption for sterilized seeds under marijuana and, reading the plain language of its regulation, recognized that the listing of THC in Schedule I did not cover the trace amounts of organic THC in the sterilized seeds. Although this notice may be characterized as a former interpretation of the regulation that can be amended by a non-legislative rule, it also evidences the fact that the THC regulation cannot be misunderstood to cover organic THC.
 
 
 51
 The case law also has given effect to the DEA's limited definition of THC in the regulation. In United States v. Wuco, 535 F.2d 1200 (9th Cir.1976), the Ninth Circuit agreed with the U.S. Attorney's concession that the listing of THC in Schedule I is limited to synthetic THC. In United States v. McMahon, 861 F.2d 8 (1st Cir.1988), the First Circuit also observed that the DEA regulation described THC as the synthetic equivalent of the substance.
 
 
 52
 Previously, the First Circuit had indicated that hashish, which contains natural THC, was included in Schedule I under the listing of THC in the CSA. United States v. Lochan, 674 F.2d 960, 969 (1st Cir.1982). The court reached this conclusion based solely on the language in the statute and did not refer to the THC regulation, 21 C.F.R. § 1308.11(d)(27). In McMahon, the First Circuit corrected this characterization, finding that hashish was included in Schedule I under marijuana because it is a derivative thereof. The McMahon court clarified that, "in view of the organic-synthetic distinction in Schedule I," the controlling provision applicable to hashish could not be Schedule I(c)(17), which refers to "synthetic, not organic, THC." McMahon, 861 F.2d at 11 (quoting 21 C.F.R. § 1308.11(d)(27)). No court has found any ambiguity in the THC regulation. We too find no ambiguity.
 
 
 53
 "An agency is not allowed to change a legislative rule retroactively through the process of disingenuous interpretation of the rule to mean something other than its original meaning." Caruso v. Blockbuster-Sony Music Entertainment Centre at the Waterfront, 193 F.3d 730, 737 (3d Cir.1999) (quoting 1 Kenneth Culp Davis and Richard J. Pierce, Jr., Administrative Law Treatise § 6.10 at 283 (1994)). Yet here the DEA similarly attempts to evade the time-consuming procedures of the APA by interpreting an existing regulation to cover naturally-occurring THC, which was consciously omitted from the scope of the current regulation. Consequently, the DEA's putative interpretive rule is invalid. To properly bring organic THC under the listing of THC, the DEA must promulgate a legislative rule in accordance with the APA, a process it has already begun. We defer consideration of the question of whether the rule promulgated by the DEA, 68 Fed.Reg. 14114 (March 21, 2003), satisfies the requirements of the APA until that case comes before us.
 
 CONCLUSION
 
 54
 Because the DEA's rule is inconsistent with the THC regulation in effect at the time of its promulgation, it is a procedurally invalid legislative rule, not an interpretive rule. We therefore have jurisdiction under 21 U.S.C. § 877. The petition requesting that we declare the rule to be invalid and unenforceable is
 
 
 55
 GRANTED.
 
 
 
 Notes:
 
 
 [1]
 While the Administrative Procedures Act labels such rules "interpretative," we will follow most other courts in using the more commonly used term
 
 
 [2]
 The industrial hemp plant itself, which falls under the definition of marijuana, may not be grown in the United States. Therefore, the seeds and oil must be imported
 
 
 [3]
 The DEA provided for a comment period ending December 10, 2001 on this third rule. The DEA has now published the final version of this legislative rule. 68 Fed.Reg. 14114 (March 21, 2003). This new legislative rule is the subject of a separate appeal involving the same parties; Ninth Circuit Docket Number 03-71366. Even if the new rule were found to be improper in the new appeal, plaintiffs would still face the possibility that the DEA might attempt to enforce the putative interpretive rule at issue here. We find a case moot when "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation."County of Los Angeles v. Davis, 440 U.S. 625, 631, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979). Since that has not occurred in the instant case, we proceed to publish this opinion at this time.
 
 
 [4]
 The DKT Liberty Project, a non-profit organization concerned with property rights, has filed an amicus brief in this case arguing that the rule, if permitted to stand, would constitute a taking in violation of the Fifth Amendment. Given the disposition of this case, we do not reach this issue
 
 
 [5]
 InAmerican Mining, the D.C. Circuit listed a fourth criterion, publication of the rule in the Code of Federal Regulations. However, in a subsequent opinion the D.C. Circuit held that publication of a rule in the CFR does not necessarily mean that the rule is not interpretive. Health Ins. Ass'n of America, Inc. v. Shalala, 23 F.3d 412 (D.C.Cir.1994). The Ninth Circuit has not held otherwise.
 
 
 [6]
 The THC amendment was adopted by the BNDD in 1968, but it was inadvertently not published in the CFR until 1970See 34 Fed.Reg. 15295 (Oct. 1, 1969).
 
 
 [7]
 The Controlled Substances Act constitutes Title II of the Comprehensive Drug Abuse Prevention and Control Act of 1970. P.L. 91-513, 84 Stat. 1242
 
 
 [8]
 Interestingly, the Administrative Controlled Substances Code Number found opposite the heading, 7370, referred in the past to synthetic THC onlySee Alexander T. Shulgin, The Controlled Substances Act 212, 297 (1988). Today 7370 refers to THC generically. See DEA List of Scheduling Actions & Controlled Substances (2000). However, the DEA continues to use a separate code number for organic, or natural, THC. The separate code number, 7371, is listed in the DEA System to Retrieve Information from Drug Evidence ("STRIDE"). This separate code number does not appear opposite the listing of THC in the DEA's regulation.
 These administrative codes are used to identify substances on Certificates of Registration issued by the Administration. Applicants for procurement, manufacturing quotas, and import or export permits must include these codes on their applications. See 21 C.F.R. § 1308.03.
 KOZINSKI, Circuit Judge, dissenting:
 I am not persuaded that this case presents a live controversy any longer. After notice and comment, the DEA has promulgated a regulation construing Schedule I of the Controlled Substances Act, 21 U.S.C. § 812(c), Schedule I(c)(17), as including both natural and synthetic THC. See 68 Fed.Reg. 14,114 (March 21, 2003). Plaintiffs concede that, so long as this regulation remains in force, the agency's interpretive rule makes no difference. The new regulation has thus "eradicated the effects" of the interpretive rule and mooted the controversy surrounding it. County of Los Angeles v. Davis, 440 U.S. 625, 631, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979).
 My colleagues reach the contrary conclusion because "[e]ven if the new rule were found to be improper in the new appeal, plaintiffs would still face the possibility that the DEA might attempt to enforce the putative interpretive rule at issue here." Majority op. at 1085, n. 3. This chain of reasoning relies on far too many subjunctives, "possibilities" and "mights" for a live controversy. We must review a legislative regulation with great deference to the agency's institutional competence and expertise. See Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 865, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The most likely outcome of the new challenge, therefore, is that we will uphold the regulation. Even if we do not, our opinion striking it down will almost certainly alter the relevant legal landscape, superceding whatever force the interpretive rule may have had. Because the opinion we issue today is gratuitous, I am unable to sign on to it.