336 F.3d 899
 RENO-SPARKS INDIAN COLONY; Great Basin Mine Watch, Petitioners,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent,
Newmont USA Limited, d/b/a Newmont Mining Corporation; State of Nevada, Division of Environmental Protection, Respondents-Intervenors.
 No. 02-71503.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted February 10, 2003.
 Filed July 16, 2003.
 
 COPYRIGHT MATERIAL OMITTED Roger Flynn, Bradley A. Bartlett, Western Mining Action Project, Boulder, Colorado, for the petitioners.
 Andrew J. Doyle, United States Department of Justice, Environment & Natural Resources Division, Washington, D.C., for the respondent.
 Marcy G. Glenn, Denise W. Kennedy, Holland & Hart, L.L.P., Denver, Colorado; William J. Frey, Deputy Attorney General, Carson City, Nevada, for the respondents-intervenors.
 On Petition for Review of an Order of the Environmental Protection Agency.
 Before: CANBY, O'SCANNLAIN, and W. FLETCHER, Circuit Judges.
 CANBY, Circuit Judge.
 
 
 1
 This appeal presents the question whether the Clean Air Act program to prevent deterioration of air quality is administered in Nevada: (1) in large air quality planning units encompassing all or nearly all of the state, or (2) in more than 250 smaller units designated by the State. The importance of the issue arises from the fact that certain pollution controls go into effect for a unit when a major pollution source applies for a permit within that unit. If the unit is very large, then a major source almost certainly has already applied, and new minor sources are subject to the controls in issue. If the unit is but one of hundreds in the State, then many units are not subject to the controls because no major pollution source is located within the unit. Minor sources are then free to begin operating there without the special pollution controls.
 
 
 2
 Petitioners Reno-Sparks Indian Colony and Great Basin Mine Watch (collectively "Reno-Sparks") contend that a mine that proposes to operate near the Colony is subject to the controls in issue because the relevant unit is the entire State or nearly so. The EPA issued a rule, however, stating that Nevada is divided into more than 250 units and has been so divided since 1978. See "Designations of Areas for Air Quality Planning Purposes; State of Nevada; Technical Correction," 67 Fed.Reg. 12474 (Mar. 19, 2002) ("2002 Nevada Rule"). Reno-Sparks now challenges that 2002 Nevada Rule on the grounds that (1) it is arbitrary, capricious and not in accordance with the law, in violation of the Administrative Procedure Act ("APA"), see 5 U.S.C. § 706; and (2) it was issued without following the APA's notice and comment procedures, see 5 U.S.C. § 553.
 
 
 3
 The 2002 Nevada Rule purports to clarify that, in the table listing Nevada's Clean Air Act designations for various airborne pollutants, codified at 40 C.F.R. § 81.329, the terms "rest of state" and "entire state" do not refer to a single baseline area for Clean Air Act purposes but to more than 250 distinct hydrographic areas, each of which constitutes its own separate baseline area. Because we conclude that the EPA acted reasonably in promulgating the Rule, we deny Reno-Sparks' petition for review.
 
 
 4
 * A. Clean Air Act
 
 
 5
 The Clean Air Act, 42 U.S.C. § 7401 et seq. establishes national ambient air quality standards (NAAQS) for a number of different airborne pollutants, including particulate matter (formerly described as total suspended particulate, or TSP, and now regulated as PM-10, or particulate matter with a diameter of ten micrometers or less), sulfur dioxide and nitrogen oxide. See 42 U.S.C. §§ 7408-7409.
 
 
 6
 In 1977, Congress amended the Act to provide for the achievement, maintenance, and enforcement of these national air quality standards. The amendments created three levels of classification for the different planning areas within a state. Areas were classified as "nonattainment" if they fell below the national air quality standards, and were classified as "attainment" if they exceeded national standards. Areas in which there was not enough data to determine whether they were in attainment or nonattainment were deemed "unclassifiable."
 
 
 7
 For attainment or unclassifiable areas, Congress established the Prevention of Significant Deterioration (PSD) program, which seeks to maintain air quality in pristine areas by governing the permissible increments of pollution increases in each planning area beyond that area's baseline pollution level.[1] 42 U.S.C. §§ 7470-7474. The permissible pollution levels established by the PSD program typically are stricter than the NAAQS levels. It is this PSD program and its enhanced pollution controls that are at issue in this appeal.
 
 
 8
 The planning areas of each state that are designated as attainment, nonattainment or unclassifiable, are known as "baseline areas." See 40 C.F.R. § 52.21(b)(15)(i). In order to determine the allowable amount of incremental pollution increase permitted in each attainment or unclassifiable area, a baseline concentration must be established. The baseline concentration of pollution is defined as the ambient concentration level existing on the minor source baseline date. See 40 C.F.R. § 52.21(b)(13)(i). That minor source baseline date for a particular baseline area is established when a major stationary source or major modification located in that baseline area submits an application for a permit under the appropriate regulations. See 40 C.F.R. § 52.21(b)(14)(ii).
 
 
 9
 The PSD limitations on pollution increases are not triggered for a baseline area until that area's baseline date, and therefore the area's baseline concentration, has been established. If the baseline concentration for a baseline area has not been triggered, then entities that are not considered major stationary sources of pollution can operate in that area subject only to the NAAQS standards rather than the more stringent PSD standards. As a result, the smaller, and hence more numerous, the baseline areas are, the less likely it is that a major source has applied for a permit within any one area, thereby establishing a baseline date. Consequently, the more baseline areas a state has, the more likely it is that a minor pollution source can find an area in which to operate where it is not subject to the requirements of the PSD program.
 
 B. Nevada's Regulatory History
 
 10
 The 1977 amendments to the Clean Air Act required states to submit proposed boundaries and designations for each baseline area to the EPA for approval. See 42 U.S.C. § 7410. The EPA was free to adopt the state's designations, or it could redesignate on its own accord. In 1977, Nevada submitted its proposed list of individual baseline areas as well as proposed designations for each area. Nevada recommended that the boundaries for baseline areas correspond to individual hydrographic areas,[2] on the theory that air flow tends to follow water flow, and that the masses of air over any particular hydrographic area were therefore likely to share similar characteristics. The proposal identified and listed 14 air basins, which were subdivided into 254 sub-basins that corresponded to the state's 254 separate hydrographic areas.[3] Each of the 254 areas was identified and numbered separately on a 1971 map of Nevada's Division of Natural Resources that was submitted to the EPA as part of Nevada's proposal.
 
 
 11
 In 1978, the EPA issued a rule establishing the official designations and baseline areas for all states, including Nevada. See 43 Fed.Reg. 8962 (Mar. 3, 1978). The EPA's list contained designations for TSP, sulfur dioxide, photochemical oxidants, and carbon monoxide. The EPA created a separate chart for each pollutant, in which it classified the state's different baseline areas as attainment, nonattainment, or unclassifiable. In the charts, each nonattainment area was listed separately. In the chart for TSP, each area that could not be classified also was listed separately. 43 Fed.Reg. at 9012-13. In the charts for sulfur dioxide and TSP, where the rest of the state was considered to be in attainment, all remaining areas were condensed onto a single line that was labeled "rest of state" or "whole state."[4] Id. Similarly, in the charts for photochemical oxidants, nitrogen oxide, and carbon monoxide, where all remaining areas were considered unclassifiable, those areas were listed on a single line with the label "rest of state." Id. The EPA's initial designations for Nevada were listed in the Code of Federal Regulations. See 40 C.F.R. § 81.329 (1978); 43 Fed Reg. at 9012-13. Nothing in the listings stated that Nevada's proposed unit boundaries were being rejected or amended.
 
 
 12
 In 1987, the EPA replaced the listed particulate pollutant TSP with PM-10. In doing so, the EPA stated that it was adopting the same baseline areas for PM-10 that it had used previously for TSP. See 58 Fed.Reg. 31622, 31630 (June 3, 1993).
 
 
 13
 In 1990, Congress passed another set of amendments to the Clean Air Act, which led to a new series of rules issued by the EPA. As part of that rulemaking, the EPA promulgated a new regulation pertaining to its designation charts, upon which Reno-Sparks heavily relies, stating:
 
 
 14
 Designated areas which are listed below as attainment ("Better than national standards") or unclassifiable ("Cannot be classified") for total suspended particulate (TSP), sulfur dioxide (SO2), and nitrogen dioxide (NO2), represent potential baseline areas or portions of baseline areas which are used in determining compliance with maximum allowable increases (increments) in concentrations of the respective pollutants for the prevention of significant deterioration of air quality (PSD). With respect to areas identified as "Rest of State" it should be assumed that such reference comprises a single area designation for PSD baseline area purposes. However, for PM-10, the use of the term "Rest of State" is an interim measure to designate as unclassifiable all locations not originally designated nonattainment for PM-10 in accordance with section 107(d)(4)(B) of the Act.
 
 
 15
 56 Fed.Reg. 56694, 56709 (Nov. 6, 1991) (codified at 40 C.F.R. § 81.300(b)) (emphasis added). The regulation, which applied generally to all the listed states, did not mention the EPA's use of the term "rest of state" in Nevada's designation listings.
 
 C. Factual Background
 
 16
 On December 4, 2001, the Oil-Dri corporation ("Oil-Dri"), the world's largest manufacturer of kitty litter, proposed to develop two open-pit mines on lands in Nevada located near the tribal lands of the Reno-Sparks Indian Colony. Worried that the construction and operation of such mines could detrimentally affect the air quality of surrounding areas, Reno-Sparks Tribal Chairman Arlen Melendez wrote to Wayne Nastri, the EPA administrator for Region IX — the region that includes Nevada — to request that the EPA subject Oil-Dri to the PSD regulations of the Clean Air Act. Chairman Melendez based his request on the fact that the lands on which Oil-Dri desired to locate its mines were included in the area listed as "rest of state" or "entire state" in the EPA's designation tables. Chairman Melendez asserted that those terms described single baseline areas within which major sources almost certainly already operated, triggering the PSD requirements and their application to Oil-Dri's proposed mining operations.
 
 
 17
 Chairman Melendez's letter sparked an internal debate at the EPA concerning whether the terms "rest of state" and "entire state" referred to a single baseline area or whether it was a shorthand notation for Nevada's residual baseline areas, encompassing more than 250 discrete baseline areas. At first, some officials within the EPA were inclined to agree with the Chairman's interpretation. On March 1, 2002, however, Nastri stated in a letter to Chairman Melendez that Oil-Dri was not subject to PSD requirements because the minor source baseline date for the hydrographic area in which Oil-Dri planned to place its mines had not yet been triggered. In the letter, Nastri also noted that the EPA recognized that the terms "rest of state" and "entire state" in the Nevada section of the Clean Air Act designations were confusing and that the EPA was working on remedying the situation.
 
 
 18
 The result was the promulgation of the 2002 Nevada Rule. 67 Fed.Reg. 12474 (Mar. 19, 2002). This Rule contains two parts that are relevant to this dispute. In Part I, the EPA stated that, from its investigation of Nevada's PSD regulatory history, it concluded that for the pollution tables for TSP, sulfur dioxide, and nitrogen oxide, the terms "rest of state" or "entire state" referred to more than 250 distinct baseline areas. See id. at 12475. In reaching this conclusion, the EPA noted that, in its original submission to the agency, Nevada identified 254 separate hydrographic areas, each of which constituted its own baseline area, and that the EPA subsequently adopted those hydrographic area designations in 1978. See id. In Part II of the Rule, the EPA drew the same conclusions with respect to PM-10 designations. The EPA recognized "that the term `rest of state' or `entire state' in these tables at 40 C.F.R. § 81.329 could be misinterpreted as designating a single attainment or unclassifiable area" and issued the rule in order to clarify that "the applicable section 81.329 tables actually refer to more than 250 individual ... attainment or unclassifiable areas." Id.
 
 
 19
 Asserting that the EPA's rationale for the 2002 Nevada Rule was mistaken and that the terms "rest of state" or "entire state" referred to single baseline areas, Reno-Sparks filed this petition for review challenging Parts I and II of the 2002 Nevada Rule.[5]
 
 II
 
 20
 Reno-Sparks argues that the 2002 Nevada Rule is arbitrary and capricious because it mischaracterizes the agency's original 1978 boundary designations for Nevada.[6] The validity of the 2002 Nevada Rule turns on three factors: (1) whether Nevada initially proposed the creation of 254 baseline areas in its 1977 submission to the EPA; (2) whether the EPA adopted Nevada's recommendation with respect to baseline areas; and (3) whether any intervening regulatory action by the EPA changed the nature of Nevada's baseline area designations. We uphold the 2002 Nevada Rule because the administrative record supports the EPA's interpretation that Nevada originally proposed 254 baseline areas, and that the EPA in 1978 adopted that proposal and never changed it in any relevant respect. Thus in the 2002 Nevada Rule, the EPA properly interpreted the terms "rest of state" and "entire state" as a shorthand reference to more than 250 separate baseline areas based on the state's hydrographic areas.
 
 
 21
 A. TSP, sulfur dioxide, and nitrogen oxide (Part I of the rule)
 
 
 1) Nevada's 1977 Proposal
 
 
 22
 In Nevada's original 1977 submission to the EPA, it proposed the creation of 254 distinct baseline areas, corresponding with hydrographic areas it previously had identified. Nevada's submission classifies air-quality status according to sub-basin (hydrographic area), and identifies each designation area by sub-basin number, indicating that it intended to use the sub-basin as the relevant baseline unit. Other state documents that were issued contemporaneously with the state's submission to the EPA clarified that the sub-basin was the appropriate baseline area unit. In a June 8, 1978 letter to the EPA, the state discussed "[t]he present classification method of using hydrographic sub-basins." Thus, the record leaves no room for doubt that Nevada intended to create 254 separate baseline areas, and made its submission accordingly.[7]
 
 
 2) The EPA's 1978 designations
 
 
 23
 The record also supports the EPA's interpretation that it adopted Nevada's designations without changing their size, notwithstanding the agency's use of the terms "rest of state" and "entire state" in the Nevada tables.[8] First, in an internal agency memorandum, the EPA stated that it had adopted Nevada's classifications, and later reaffirmed its statement in a 1979 rule. See 44 Fed.Reg. 16388, 16391 (Mar. 19, 1979).
 
 
 24
 Second, there is no indication that the EPA changed the baseline area designations after Nevada submitted them. In the EPA's 1978 rule listing the initial designation areas and their classifications, the EPA noted that, if its final designations differed from a state's proposed designations, either with respect to area size or classification, those changes would be noted in the tables with an asterisk. 43 Fed. Reg. at 8964. In the Nevada tables, several listings contain an asterisk to note that the EPA changed Nevada's proposed designation. In each instance, however, the EPA changed only the classification status of the baseline area (e.g., from attainment to unclassifiable) and left the area boundaries unchanged. 43 Fed.Reg. at 9012-13. Significantly, the listings labeled "rest of state" or "entire state" in each table do not contain an asterisk, see id., indicating that the use of those terms was never intended to combine Nevada's proposed designations into a single baseline area. Moreover, each area that was separately listed in the Nevada tables was designated by its sub-basin name and number (e.g., "San Emido Desert (22)") contained in Nevada's submission, suggesting that each sub-basin constituted a separate baseline area. See id. Thus, the EPA reasonably concluded in 2002 that it had established 254 separate baseline areas in Nevada in 1978 rather than single baseline areas denoted by the terms "rest of state" and "entire state."
 
 
 25
 Third, the record supports the EPA's position that it used the terms "rest of state" and "entire state" as proxies for the more than 250 unlisted baseline areas because there was insufficient space in the agency's tables to list each area separately. In its 1978 rule, the EPA stated that in some cases, "the descriptions of the designated areas submitted by the States were so lengthy as to prohibit their publication in the limited space available in the tables presented below. Exact descriptions of all areas designated are available at the appropriate Regional Offices or the State in question." 43 Fed.Reg. at 8964. Nevada's 254 separate area listings reasonably could constitute a prohibitively lengthy list.
 
 
 26
 Finally, in each table the EPA used "rest of state" or "entire state" only once, and used it in reference to whichever classification encompassed the majority of baseline areas. For example, Nevada's TSP table lists separately every nonattainment area, and every unclassifiable area, using the hydrographic baseline areas. It is unlikely that, after so employing the smaller units, the EPA would in a single term created an entirely different type of unit for the remaining areas that were in attainment. The more reasonable interpretation is that the EPA used the term "rest of state" or "entire state" as a collective reference to small units too numerous to identify individually with convenience.
 
 
 3) Subsequent Regulatory History
 
 
 27
 Reno-Sparks argues that regardless of the EPA's intent in 1978, the 2002 Nevada Rule is arbitrary and capricious because it directly contradicts the agency's 1991 regulation stating that the term "rest of state" should be "assumed" to constitute a single baseline area. See 40 C.F.R. § 81.300(b). Although the 1991 regulation caused no small amount of confusion regarding the meaning of the terms "rest of state" with respect to Nevada, the EPA reasonably concluded that the 1991 regulation neither changed the 1978 adoption of Nevada's 254-unit proposal nor eroded the basis for the 2002 Nevada Rule clarifying the existence of more than 250 units in Nevada.
 
 
 28
 The 1991 regulation was directed to all the listed states, and did not directly address the Nevada designations. It contained no operative language changing the Nevada designations. There is no indication that the disputed "assumption" took account of the use of the terms "rest of state" and "entire state" in the Nevada tables, or of the history surrounding the original 1978 baseline designations for Nevada. There also is no indication that the EPA intended the regulation to effect what would be a sweeping change in Nevada's baseline area designations. The fact that the 1991 reference to an assumption of single large units drew no comment during the regulatory process suggests that no such drastic change was contemplated or occurred. As a result, it was reasonable for the EPA to conclude in 2002 that the 1991 regulation effected no change in Nevada's system of more than 250 baseline units.
 
 
 29
 Second, the 1991 rule indicates only that it should be "assumed," rather than mandated, that "rest of state" comprises a single designation area. 40 C.F.R. § 81.300(b). The regulation therefore implies that the assumption of a single baseline area can be negated by evidence that the terms were not intended to define a single baseline area for PSD purposes. The record evidence that Nevada intended to create 254 baseline areas based on hydrographic areas or sub-basins combined with the evidence that the EPA adopted Nevada's baseline area designations is sufficient to nullify the stated assumption.
 
 
 30
 There is no doubt that the reference in the 1991 regulation to the "assumption" concerning the meaning of "rest of state" caused considerable confusion, not only among petitioners but also among officials in the EPA. That unfortunate consequence does not reflect well on the EPA's draftsmanship in 1991. But the 1991 regulation did not change the fact that the EPA created 254 separate baseline areas in Nevada in 1978, nor did the 1991 regulation purport to amend those areas. We conclude that it was not arbitrary or capricious for the EPA to conclude, in its 2002 Nevada Rule, that the original designation of more than 250 areas still stands today.
 
 B. PM-10 (Part II of the Rule)
 
 31
 For similar reasons, we uphold Part II of the 2002 Nevada Rule, which states that Nevada has 256 baseline areas for PM-10.
 
 
 32
 After the EPA added PM-10 as a regulated pollutant in 1993, it stated that the baseline areas used for TSP would also be used for PM-10. See 58 Fed.Reg. 31622, 31630 (June 3, 1993) ("EPA continues to believe that it is appropriate to retain the original TSP baseline dates and baseline areas as part of the program for implementing the PM-10 increments."); 40 C.F.R. § 51.166(b)(15)(iii) ("Any baseline area established originally for the TSP increments shall remain in effect and shall apply for purposes of determining the amount of available PM-10 increments...."). Because Nevada, for reasons we have already explained, had 256 baseline areas for TSP, the EPA reasonably concluded in its 2002 Nevada Rule that there were 256 baseline areas with respect to PM-10.
 
 
 33
 Reno-Sparks argues that a rule adopted on November 13, 2002, after promulgation of the 2002 Nevada Rule, illustrates that for PM-10, Nevada had just one statewide baseline area. In that rule, the EPA approved "a request from the State of Nevada... to redesignate the current single unclassifiable area for [PM-10] into numerous individual areas to be consistent with area definitions for other pollutants." 67 Fed.Reg. 68769 (Nov. 13, 2002). Reno-Sparks argues that this statement demonstrates that, prior to the November 13, 2002, Nevada had only one baseline area for PM-10.[9]
 
 
 34
 The EPA's explanation for its action in the November 13 rulemaking, however, demonstrates that it was not making any changes to Nevada's baseline areas. One of the submitted comments regarding the November 13, 2002 rule expressed the concern that breaking down a single baseline area into many other baseline areas would allow industries to pollute more. See id. at 68769-70. In response, the EPA stated that the commenter's fear was "based on the incorrect belief ... that prior to the EPA's present action, the State consisted of a single PSD baseline area for PM-10. Prior to the EPA's action ... the State's 253 hydrographic areas had already been established as the PSD baseline areas for particulate matter.... Today's rule has no effect on the PSD baseline areas for PM-10 in the State...." Id. at 68770. The November 13 rule accordingly casts no doubt on our conclusion upholding as reasonable the EPA's 2002 Nevada Rule specifying 256 PM-10 units in Nevada.[10]
 
 III
 
 35
 We reject Reno-Sparks' argument that the EPA violated the APA by issuing the 2002 Nevada Rule without allowing for notice and comment.[11] The APA requires an agency proposing a new rule to provide notice of the rule and an opportunity for interested parties to comment. 5 U.S.C. § 553(b-c). An agency need not comply with the above requirements, however, when its proposed rule is interpretive rather than legislative. See 5 U.S.C. § 553(b)(3)(A). Legislative rules, also known as substantive rules, are "those which effect a change in existing law or policy," Powderly v. Schweiker, 704 F.2d 1092, 1098 (9th Cir.1983), or which "impos[e] general, extra-statutory obligations pursuant to authority properly delegated by the legislature." Alcaraz v. Block, 746 F.2d 593, 613 (9th Cir.1984); see also Hemp Industries Ass'n v. Drug Enforcement Administration, 333 F.3d 1082, 1087 (9th Cir.2003). Interpretive rules, on the other hand, "merely clarify or explain existing law or regulations." Powderly, 704 F.2d at 1098. Interpretive rules instruct as to what an agency thinks a statute or regulation means. See Alcaraz, 746 F.2d at 613. We construe narrowly the APA's interpretive rule exception. See Sequoia Orange Co. v. Yeutter, 973 F.2d 752, 757 (9th Cir.1992).
 
 
 36
 By these standards, the 2002 Nevada Rule was interpretive because it does not change existing substantive law. The terms "rest of state" and "entire state" carry the same meaning for Nevada with or without the EPA's 2002 Nevada Rule. The Rule is nothing more than the EPA's explanation of what the pre-existing substantive law means. Thus, the rule is interpretive, and the EPA did not err by foregoing notice and comment procedures.[12]
 
 IV
 
 37
 The EPA's 2002 Nevada Rule specifying that Nevada was divided into more than 250 baseline areas for purposes of the PSD program was neither arbitrary nor capricious nor out of accordance with law. See 5 U.S.C. § 706(2)(A).
 
 
 38
 PETITION FOR REVIEW DENIED.
 
 
 
 Notes:
 
 
 [1]
 Although the Clean Air Act regulates a number of airborne pollutants, the PSD program and the 2002 Nevada Rule affect only nitrogen oxide, sulfur dioxide, and PM-10See 42 U.S.C. § 7473; 40 C.F.R. § 52.21(c). They do not affect the EPA's designations with respect to carbon monoxide, ozone, or lead.
 
 
 [2]
 A hydrographic area is a regional designation that follows natural movements in water flow and air flow according to the area's geography and topography
 
 
 [3]
 Nevada's submission to the EPA erroneously stated that there were only 253 hydrographic areas, when in fact there were 254. Because two of Nevada's original baseline areas subsequently have been subdivided, Nevada now claims to have 256 baseline areas
 
 
 [4]
 The phrase "whole state" was later changed to "entire state." The parties do not allege that this change carries any legal significance
 
 
 [5]
 Reno-Sparks does not challenge Part III of the rule, in which the EPA codified a redesignation of the Las Vegas carbon monoxide nonattainment area from "moderate" to "serious." 67 Fed.Reg. at 12476
 
 
 [6]
 Under the APA, we will uphold an agency's rule unless it is arbitrary, capricious, or otherwise not in accordance with the lawSee 5 U.S.C. § 706. An agency's interpretation of its own regulation must be upheld unless an "alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation." Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994). The 2002 Nevada Rule being challenged here needs no interpretation, but it contains an interpretation of the terms "rest of state" or "entire state" in the EPA's earlier regulation, 40 C.F.R. § 81.329. Reno-Sparks contends that we need not defer to that interpretation because it conflicts with the EPA's statement in 40 C.F.R. § 81.300(b) that those terms should be assumed to signify a single baseline area. For reasons that we discuss later in the opinion, we conclude that the 1991 rule, although confusing, does not change the 1978 Nevada designations or their interpretation. As a result, the EPA remains entitled to deference. Even if we were not to defer, however, we would conclude that the EPA was correct in ruling that in 1978 it had adopted Nevada's designation of 250-odd units as baseline areas, and had not changed that designation.
 
 
 [7]
 Reno-Sparks argues that, even if Nevada did not intend to create a single baseline area, its use of the term "air basin" in its submission demonstrates that it intended to define baseline areas according to the state's fourteen air basins rather than its 254 sub-basins. This argument is unpersuasive. First, the submission identifies major air basins and sub-basins on separate charts and in separate lists. If only the major basins were relevant for Clean Air Act purposes, there would have been no reason for Nevada to identify the sub-basins, or list them in separate tables. Second, the submission often used the term "air basin" when it intended to refer to a sub-basin. Third, ample evidence that we have already discussed indicates that Nevada intended to create 254, rather than fourteen, baseline areas. For much the same reasons, we find no merit in Reno-Sparks' alternative contention that Nevada is divided into three air quality areas reflecting federal air quality control areas
 
 
 [8]
 The fact that the EPA rejected Nevada's State Implementation Plan ("SIP") does not mean that it also rejected Nevada's baseline area designationsSee 40 C.F.R. § 52.1485 (rejecting Nevada's SIP). The rejection of that plan meant only that Nevada's designations were not adopted automatically, but were subject to EPA oversight and approval. See 42 U.S.C. § 7410.
 
 
 [9]
 It would not benefit Reno-Sparks to demonstrate that the November 13 rule effected a change if that change created the small units to which Reno-Sparks objects. Reno-Sparks states, however, that it intends to mount an independent challenge to the November 13 rule. We therefore address Reno-Sparks' contention
 
 
 [10]
 Reno-Sparks argues that the EPA's promulgation of the 2002 Nevada Rule violated a number of Clean Air Act procedural requirements governing the redesignation of a state's baseline area boundaries or classifications,see 42 U.S.C. § 7407(d), and governing the EPA's revision of its Federal Implementation Plan (FIP) for Nevada, see 42 U.S.C. § 7607(d). These requirements come into play, however, only if the EPA redesignates an area or revises a FIP. Because the 2002 Nevada Rule simply clarifies and reaffirms the agency's designations for Nevada as they have existed since 1978, it neither redesignates baseline areas nor revises the FIP for Nevada. Thus, the EPA was not required to comply with these procedural requirements prior to adopting the 2002 Nevada Rule.
 
 
 [11]
 This Court reviews de novo the agency's decision not to follow the APA's notice and comment procedures. The agency is not entitled to deference because complying with the notice and comment provisions when required by the APA "is not a matter of agency choice."Sequoia Orange Co. v. Yeutter, 973 F.2d 752, 757 n. 4 (9th Cir.1992).
 
 
 [12]
 The EPA is entitled to raise the interpretive rule exception even though the agency did not rely on it when it promulgated the rule. The ultimate decision whether a rule is legislative or interpretive is for the court to make, even if the issue is raised for the first time on appealSee Levesque v. Block, 723 F.2d 175, 180-81 (1st Cir.1983); see also Alcaraz, 746 F.2d at 613 (deciding whether a rule was legislative or interpretive even though the agency never considered the issue).